# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| **FORGENT NETWORKS, INC.,** | **CIVIL ACTION NO. 6:06-CV-208 (LED) CONSOLIDATED** |
| **Plaintiff,** | |
| | **JURY TRIAL DEMANDED** |
| **v.** | |
| **ECHOSTAR COMMUNICATIONS CORPORATION, et al.** | |
| **Defendants.** | |
| **SCIENTIFIC ATLANTA, INC. and MOTOROLA, INC.** | |
| **Plaintiffs** | |
| **v.** | |
| **FORGENT NETWORKS, Inc.** | |
| **Defendant.** | |

## ECHOSTAR AND DIGEO'S CLAIM CONSTRUCTION BRIEF RE TELECONFERENCING

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..............................................................................................1

II.  BACKGROUND ..............................................................................................2

III.  ARGUMENT ....................................................................................................2

    A.  Claim Construction after *Phillips*. .......................................................3

    B.  The Specification Demonstrates that the Claims are
        Directed to a Teleconferencing Invention...............................................7

        1.  The Invention as a Whole is Described as a
            Teleconferencing System............................................................8

            a.  The Abstract.....................................................................8

            b.  The Background of the Invention ....................................9

            c.  The Summary of the Invention ......................................12

        2.  The Preferred Embodiment is a
            Teleconferencing System..........................................................12

        3.  The Frequent Use of the Term "Message"
            Demonstrates that the Invention is a
            Teleconferencing System..........................................................20

    C.  The Claims Include Teleconferencing Limitations................................21

        1.  The Term "Video Processing Device" Means
            "A Device that Processes Video
            Teleconferencing Messages." .....................................................22

        2.  The Term "Communication Central Processing
            Unit" Means "CPU That Processes
            Teleconferencing Messages." .....................................................23

        3.  The Term "Communication Bus" Means "Bus
            Through Which Teleconferencing Signals are
            Transmitted." ............................................................................25

IV.  FORGENT'S PROPOSED CONSTRUCTIONS ARE
     WRONG .........................................................................................................26

    A.  "Video Processing Device"....................................................................28

    B.  "Communication Central Processing Unit" ...........................................29

    C.  "Communication Bus" ...........................................................................30

V.  CONCLUSION................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Alloc, Inc. v. International Trade Commission,*
  342 F.3d 1361 (Fed. Cir. 2003) ...............................................................6, 22

*Apple Computer, Inc. v. Articulate Sys., Inc.,*
  234 F.3d 14 (Fed. Cir. 2000) .......................................................................11

*Astrazeneca AB v. Mutual Pharm. Co.,*
  384 F.3d 1333 (Fed. Cir. 2004) ...................................................5, 12, 20, 28

*Biogen, Inc. v. Berlex Labs., Inc.,*
  318 F.3d 1132 (Fed. Cir. 2003) ............................................ 9 & n.6, 11, 19, 23

*Boss Control, Inc. v. Bombardier Inc.,*
  410 F.3d 1372 (Fed. Cir. 2005) ............................................................8, 12, 23

*C.R. Bard, Inc. v. United States Surgical Corp.,*
  388 F.3d 858 (Fed. Cir. 2004) ............................................................... *passim*

*Comark Commc'ns, Inc. v. Harris Corp.,*
  156 F.3d 1182 (Fed. Cir. 1998) .......................................................7, 27, 29

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*
  438 F.3d 1374 (Fed. Cir. 2006) ......................................................3, 4, 7 n.5, 24

*Hill-Rom Co. v. Kinetic Concepts, Inc.,*
  209 F.3d 1337 (Fed. Cir. 2000) ...............................................................8, 9

*Honeywell Int'l, Inc. v. ITT Industries, Inc.,*
  452 F.3d 1312 (Fed. Cir. 2006) ........................................... 4 & n.2, 11, 20

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.,*
  450 F.3d 1350  (Fed. Cir. 2006) .................................................................4, 5, 20

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
  358 F.3d 898 (Fed. Cir. 2004) ..........................................................12, 20

*LizardTech, Inc. v. Earth Resource Mapping, Inc.,*
  424 F.3d 1336 (Fed. Cir. 2005) ...............................................................4

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004) ......................................................... *passim*

*Netword, LLC v. Centraal Corp.,*
  242 F.3d 1347 (Fed. Cir. 2001) ...............................................................20

*Nystrom v. Trex Co., Inc.,*
  424 F.3d 1136 (Fed. Cir. 2005) ..................................... 4, 5, 6 & n.4, 11

*On Demand Machine Corp. v. Ingram Indus., Inc.,*
  442 F.3d 1331 (Fed. Cir. 2006) ....................................... 3, 4, 5 & n.3, 20, 23 & n.20

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...................................................................... *passim*

*SanDisk Corp. v. Memorex Prods., Inc.*,
  415 F.3d 1278 (Fed. Cir. 2005) ...................................................................9 n.7, 27

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ...................................................................6, 9, 22

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
  222 F.3d 958 (Fed. Cir. 2000) ...............................................................................9

*Wang Labs, Inc. v. Am. Online, Inc.*,
  197 F.3d 1377 (Fed. Cir. 1999) ...................................................................20 n.17

*Watts v. XL Sys., Inc.*,
  232 F.3d 877 (Fed. Cir. 2000) ....................................................................20 n.17

## MISCELLANEOUS

*Manual of Patent Examining Proc.*, § 608.01(b) ...................................................9 n.8

## I.    INTRODUCTION

In this case, Forgent contends that defendants' DVR set-top boxes infringe U.S. Patent No. 6,285,746. *See* Crotty Decl., Ex. A ('746 patent). For the reasons set forth in EchoStar's fully-briefed motion for summary judgment filed on July 18, 2006 (Docket No. 259), the claims of the '746 patent are invalid as indefinite because they contain errors that cannot be corrected by a court. Thus, the Court only needs to construe the claims if it denies that motion.

If the claims need to be construed, the specification of the '746 patent describes, at best, a narrow invention relating to improved teleconferencing systems. Specifically, the invention addresses the "problem" of coordinating schedules for a live teleconference by allowing a video teleconferencing message to be recorded and played back later, much in the familiar way a voicemail message is recorded and played back. Indeed, the patent expressly analogizes its invention to a voicemail system. The claims must be interpreted in the context of this disclosure of the invention.

There are three terms that reflect and express the teleconferencing limitations disclosed in the specification:  (1) the term "video processing device" means "a device that processes teleconferencing messages;" (2) the term "communication central processing unit" means a "CPU that processes teleconferencing messages," and (3) the term "communication bus" means "a bus through which teleconferencing signals are transmitted."[1]  These terms did not have a commonly understood meaning to those of skill in the art, and they are not defined in the patent. Indeed, the term "video processing device" is not even used in the specification at all. Thus, the meaning of these terms must be ascertained from the specification, which describes only teleconferencing devices that receive, store, and retrieve messages. This brief addresses only

---

[1] Defendants Cable One, Inc., Charter Communications, Inc., Comcast Corp., Comcast STB Software DVR, LLC, Coxcom, Inc., and Time Warner Cable Inc. and Declaratory Judgment Plaintiffs Motorola, Inc. and Scientific-Atlanta, Inc., join this brief as to the term "video processing device."

these three terms.  Additional proposed claim constructions are set forth in a separate brief, filed herewith.

## II.     BACKGROUND

In the early 1990s, while working at VideoTelecom Corp., a company that designed and sold teleconferencing systems, Joe W. Duran, Michael V. Jenkins, and William T. Clayton developed a product that was ultimately called MediaMax.  *See* Crotty Decl, Ex. B (MediaMax Operations Manual (Aug. 1992) (FN 36471-36618)).  Forgent contends that the development of MediaMax constitutes the conception of the claims of the '746 patent.

MediaMax is a computer-based conferencing device, which provides audio, video, graphics, and data teleconferencing capabilities.  The MediaMax unit connects to a keyboard or tablet, and to one or more monitors, cameras, microphones, and speakers.  Relying on these peripherals, the device allows users in remote locations to participate in the same teleconference.  VideoTelecom also sold an optional MediaMax feature, called VideoMail, that allowed a user to record and play messages with audio and video content.  *See* Crotty Decl, Ex. B (MediaMax Operations Manual) at FN 36593; Crotty Decl., Ex. C (VideoMail Functional Specification (Mar. 27, 1992) (FN6521-28)).

On May 21, 1991, Messrs. Duran, Jenkins, and Clayton filed a patent application that disclosed a teleconferencing system with the ability to receive and store a message for later retrieval and playback.  The application was assigned to VideoTelecom.

## III.    ARGUMENT

The specification of the '746 patent discloses an invention that relates to teleconferencing devices with certain functionality.  The Abstract, Background of the Invention, and the Summary of the Invention sections of the specification describe the invention as a teleconferencing system that solves scheduling conflicts by providing storage of messages for later playback.  The sole disclosed embodiment is a two-party teleconferencing system.  The specification characterizes "the invention" as a teleconferencing system.  Recent Federal Circuit case law makes it clear that claims should be construed in accordance with a patent's disclosure.  Therefore, the claims of the

'746 patent should be understood as directed to the disclosed teleconferencing invention, and interpreted accordingly.

## A.    Claim Construction after *Phillips*.

Particularly since the *en banc* decision in *Phillips*, the Federal Circuit has repeatedly "stressed the dominance of the specification in understanding the scope and defining the limits of the terms used in the claim."  *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1337-38 (Fed. Cir. 2006) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*)); *see also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006).  This is because the "scope and outer boundary of the claims is set by the patentee's description of his invention."  *On Demand Machine*, 442 F.3d at 1338.  As the Federal Circuit summarized:

> In *Phillips*, the *en banc* court explained that the role of the specification is to describe and enable the invention.  In turn, the claims cannot be of broader scope than the invention that is set forth in the specification.

*Id*. at 1340 (citation omitted).  In this case, however, Forgent seeks to construe the claims more broadly than the invention disclosed in the specification.  Forgent's proposed constructions would impermissibly broaden the scope of the claims and would require the Court to ignore the Federal Circuit's recent emphasis on the primary role of the specification in claim construction. As the *Phillips* court noted:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d 1316 (citation omitted).  In sharp contrast to Forgent's proposed constructions, the constructions proposed herein are true to the claim language and naturally align with the patent's description of the invention.

Recent cases that follow *Phillips* and properly confine claim terms to the invention disclosed in the specification are numerous.  *See, e.g., Curtiss-Wright Flow Control*, 438 F.3d at

1380; *Honeywell Int'l, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312 (Fed. Cir. 2006); *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350 (Fed. Cir. 2006); *On Demand Machine*, 442 F.3d at 1340; *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1343 (Fed. Cir. 2005); *Nystrom v. Trex Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005).

In *Honeywell International, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312 (Fed. Cir. 2006), Honeywell argued that the district court erred by limiting the term "fuel injection system component" to a fuel filter and including no other component of a fuel injection system. However, citing *Phillips*, the Federal Circuit agreed "that the claim term 'fuel injection system component' is limited to a fuel filter." *Id*. at 1318. The Court noted that the specification used limiting language and that on several occasions, the written description referred to the fuel filter as "this invention" or "the present invention." *Id*. The Court found that "the written description provides only a fuel filter that is made with polymer housing and electrically conductive fibers interlaced therein. No other fuel injection system component with the claimed limitations is disclosed or suggested."[2] *Id*. at 1319. The Court rejected Honeywell's argument that the district court imported a limitation from the specification into the claims and thereby improperly limited the scope of the claims to the preferred embodiment.

Similarly, in *On Demand Machine Corp. v. Ingram Industries, Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006), the Federal Circuit determined that the term "customer" meant "retail customer" rather than any customer, even though the term was not explicitly limited in the claim. The Court relied on *Phillips* in finding that the specification "repeatedly reinforces" the narrower construction. *Id*. Indeed, the Court read *Phillips* to *prohibit* the claims from being "of broader scope than the invention that is set forth in the specification." *Id*. Accordingly, the Court rejected the patentee's argument that the dictionary meaning of "customer" applied and that the

---

[2] Notably, the Court discounted prosecution history statements by the applicant that the fuel injection component limitation included components in addition to a fuel filter, explaining that where the specification clearly describes what the patentee claims as his invention, "an expression by the patentee during prosecution that he intends his claims to cover more than what his specification discloses is entitled to little weight." *Honeywell*, 452 F.3d at 1319.

invention was not limited to a specific kind of customer, holding that "when the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope." *Id*. (citing *Astrazeneca AB v. Mutual Pharm. Co.*, 384 F.3d 1333, 1339-40 (Fed. Cir. 2004)).[3]

In *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350 (Fed. Cir. 2006), the Federal Circuit again limited a term in light of the specification. The Court found that the term "host interface" meant "a direct parallel bus interface" rather than any interface for providing communication with a host, as the patentee had proposed. *Id*. at 1357. The specification, including the "Background of the Invention" section, disparaged other interfaces and touted the significance of a direct parallel bus. *Id*. at 1355-56. The Court also "observed that the only host interface described in the specification is a direct parallel bus interface." *Id*. at 1354. Thus, despite the fact that the term was not limited in the claim, the Federal Circuit affirmed a finding that the term "host interface" was limited to a specific type of interface.

In *Nystrom v. Trex Co., Inc*., 424 F.3d 1136 (Fed. Cir. 2005), the Federal Circuit affirmed a finding that the term "board" meant a "piece of elongated construction material made from wood cut from a log," despite the fact that the claim did not expressly include that limitation and the fact that some general dictionaries did not limit the term "board" to wooden materials. *Id*. at 1142, 1144. The Court explained that the specification consistently used the term "board" to refer to wood from a log. Moreover, the Background section of the patent framed the invention in the context of wooden boards, *even though* it acknowledged that other materials existed. *Id*. at 1143 (emphasis added). The Court rejected Nystrom's argument that there was no explicit disavowal in the written description because, "as explained in *Phillips*, Nystrom is not entitled to a claim construction divorced from the context of the written description and prosecution

---

[3] The Court additionally construed, based on the invention's clearly stated purpose and scope as described by the specification and prosecution history, the term "sales information" more narrowly than both the district court's limited construction and the much broader definitions provided by general dictionaries. *On Demand Machine*, 442 F.3d at 1338-39.

history." *Id.* at 1444-45.  Thus, the Court limited the meaning of the term "board" to the meaning consistently used in the specification.[4]

The Federal Circuit has also approvingly cited the reasoning of several pre-*Phillips* cases, including *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001).  In *SciMed*, the sole claim construction issue was "whether the common specification of the three patents limits the scope of the claims to catheters with coaxial lumens." *Id.* at 1340.  The patentee argued that the claims should have been construed to include catheters with not only coaxial but also dual or side-by-side lumens.  The Court found an analysis of the specification led to the "inescapable conclusion" that the references in the claims "must be understood as referring to coaxial lumens, and thus that the asserted claims read only on catheters having coaxial lumens."  *Id.* at 1342.  Thus, the Court limited the claims to the catheters having coaxial lumens.

In *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361 (Fed. Cir. 2003), the Court found that the claims of a patent for systems and methods of joining floor panels included a limitation for "play" between the panels, even though the claims were not expressly so limited. In a section entitled "Technical Problems and Objects of the Invention," the specification made clear that "play" was part of the invention, touting its advantages.  *Id.* at 1369-70.  Moreover, all of the figures and the preferred embodiments included "play."  The Court noted that "the patents do not show or suggest any systems without play."  *Id.* at 1370.  "Thus, the specification teaches that the invention as a whole, not merely a preferred embodiment, provides for play in the positioning of floor panels."  *Id.* at 1369.

Thus, particularly since *Phillips*, the Federal Circuit has construed claim terms to correspond to the scope of the invention disclosed in the specification.  The Court has done so even though the words of the claims — "customer," "interface," "board," and "catheter" —

---

[4] For the same reasons, the Court also affirmed the district court's limiting construction of "manufactured to have" to mean "a manufacturing process utilizing *woodworking techniques*."  *Nystrom*, 424 F.3d at 1146 (emphasis added).

clearly had well-known, broader meanings outside the context of their patents.  Construing terms in such a manner is *not* impermissibly reading limitations from the specification into the claims.  Rather, it is reading the claims in light of a limited disclosure in the specification.[5]  The Federal Circuit has stated:  "we recognize that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice."  *Phillips*, 415 F.3d at 1323; *see also Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186-87 (Fed. Cir. 1998) ("[T]here is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification.").  As demonstrated below, EchoStar and Digeo's proposed constructions fall on the proper side of the "fine line" identified by the Federal Circuit.

### B. The Specification Demonstrates that the Claims are Directed to a Teleconferencing Invention.

The Federal Circuit has identified several factors that point to proper interpretations that are clearly bounded by the scope of the invention set forth in the specification.  For example, "[s]tatements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term."  *See, e.g., C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004); *see also Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004).

The statements in the '746 patent limiting the invention to an improved teleconferencing system are *precisely* the sort of statements that support confining the scope of the claims to the disclosure in the specification.  The entirety of the '746 patent is directed to improving existing teleconferencing systems, including, in particular, several sections that "describe the invention as a whole," such as the Abstract, Background of the Invention, and the Summary of the Invention.

---

[5] Indeed, the Federal Circuit has not hesitated to reverse district courts that fail to construe claim terms properly in light of the specification.  *See, e.g., Curtiss-Wright Flow Control*, 438 F.3d at 1379 ("This court commends the district court's reluctance to narrow the claims to the preferred embodiment.  In this instance, however, that care is admirable but misplaced.").

Although Forgent's claim construction brief virtually ignores them, these sections of the patent are highly relevant to claim construction because they all define the invention as an improved teleconferencing system.  Indeed, the *only* embodiments disclosed in the specification describe an improved teleconferencing system, confirming that the patent's claims should be similarly construed.  *See, e.g., Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1377-78 (Fed. Cir. 2005) (holding that a patentee's choice of embodiments can shed light on the intended scope of the claims.).

## 1.    The Invention as a Whole is Described as a Teleconferencing System.

### a.    The Abstract

The Abstract clearly and unequivocally describes the invention as a teleconferencing system that processes messages (emphasis added):

> A *teleconferencing system* with capability to store incoming multiple *medium messages* for later retrieval and playback is disclosed.  The system includes a communications multiplexer which, in normal mode, receives the *incoming message* and routes the *message* to various output functions, including video, audio, and computer display.  In store mode, the communications multiplexer receives the *incoming message* and communicates it to disk storage, for example by way of direct memory access.  During playback, the communications multiplexer receives data from the disk storage, and controls its communication to the various output functions, in the same manner as during receipt of a normal incoming *message* during an interactive *teleconference*.  As a result, *multiple medium messages may be stored for later retrieval, with the playback appearing in the same manner as a conventional teleconference message*.

The Federal Circuit has specifically held that the abstract is relevant to claim construction:  "We have frequently looked to the abstract to determine the scope of the invention."  *Hill-Rom Co. v.*

*Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.1 (Fed. Cir. 2000) (collecting cases); *see also Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 965 n.2 (Fed. Cir. 2000).[6]

Although it is virtually ignored by Forgent,[7] the Abstract plainly characterizes the invention as a "teleconferencing system" that can store an incoming "teleconferencing message" for later retrieval and playback. It describes the invention as a whole,[8] demonstrating that the claims are directed to teleconferencing devices. *See C.R. Bard*, 388 F.3d at 864; *Microsoft*, 357 F.3d at 1348; *Biogen*, 318 F.3d at 1136-40. In other words, "from the outset," the specification identifies the invention as a teleconferencing system. *See SciMed*, 242 F.3d at 1342 (analyzing abstract and limiting claim).

### b.      The Background of the Invention

As the title indicates, the "Background of the Invention" characterizes the invention as a whole. *See* '746 patent at 1:14-2:34. The section begins by detailing the significance of teleconferencing in the business world, including video conferencing:

> In the business world, face-to-face meetings generally include the exchange of information by way of various media…. The ability to communicate one's point using the most effective medium available, together with the opportunity to observe participants' reactions, cause many people to favor face-to-face meetings over communication by mail, FAX, or telephone.

---

[6] Federal Circuit cases that cite abstracts in connection with claim construction are numerous. *See, e.g.*, *C.R. Bard*, 388 F.3d at 860-61; *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1136-40 (Fed. Cir. 2003).

[7] Forgent's citations to the specification are highly selective, as they must be to avoid the numerous statements characterizing the invention as an improved teleconferencing system. Of course, the Federal Circuit has rejected Forgent's approach to claim construction and has instead emphasized that claims must be construed in light of the *full* specification. *See, e.g., Phillips*, 415 F.3d at 1313; *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("The court must always read the claims in view of the *full* specification." (emphasis added)).

[8] The Abstract must contain a "concise statement of the technical disclosure of the patent," including "that which is new in the art to which the invention pertains." Crotty Decl., Ex. D (*Manual of Patent Examining Proc.*, § 608.01(b) (8th ed., rev. 3, Aug. 2005)).

*Id*. at 1:15-29.  The specification goes on to describe the then-current state of the

teleconferencing art, including a system sold by VideoTelecom.  *Id.* at 1:50-52 ("An example of

a modern teleconferencing system is the CS420R system manufactured and sold by

VideoTelecom Corporation of Austin, Tex.").  The specification states that advances in

communications led to more complex teleconferencing systems and emphasizes the importance

of improved systems:

> Systems have recently become available which enable the
> conducting of meetings and conferences over long-distances,
> communicating not only audio information but also video,
> documents, graphics, and other types of information.…  The speed,
> accuracy and reliability of communication over *telephone lines*,
> particularly digital *telephone networks*, has now improved to the
> extent that video and graphics information can be transmitted
> thereover, at sufficiently high rates that real-time teleconferencing
> can include audio, video, and computer graphics information.  The
> ability to communicate multiple medium presentations has made
> *video teleconferencing* much more attractive to the participants,
> reducing the need of personnel to travel or relocate for effective
> communications and management.

*Id*. at 1:30-49 (emphasis added).

The specification then identifies the supposed problem with pre-existing teleconferencing

systems, namely that all of the participants needed to be on the teleconference at the same time:

> [A]n interactive conference requires that the parties each be
> connected to the system at the same time.  Scheduling conflicts,
> time zone differentials, and other events which prevent parties
> from meeting face-to-face, also preclude meeting by phone or
> teleconference.  These factors have presented the need for storage
> and retrieval of messages.

*Id*. at 2:6-11.  Thus, the patent states that the invention addresses the problem of scheduling

teleconferences by providing a way to store and retrieve the teleconference for later playback.

The invention addresses the "need" it identifies — namely improving existing teleconference

systems by allowing participants to record and retrieve teleconferencing communications.  The

specification states that there were existing message storage systems (*e.g*., voicemail), but that

"today's complex worldwide business climate" needed systems "to transmit and store full

multiple-media presentations for later retrieval."  *Id*. at 2:19-21.  The Federal Circuit has held

that the "prior art problem" identified in the specification is relevant to claim construction.  *See, e.g.*, *Honeywell Int'l*, 452 F.3d at 1318 ("The written description's detailed discussion of the prior art problem addressed by the patented invention, *viz.*, leakage of non-metal fuel filters in EFI systems, further supports the conclusion that the fuel filter is not a preferred embodiment, but an only embodiment.").  The description of the problem addressed by the invention and the "need" in the art confirms that the claims are directed to an improved teleconferencing system.

The specification next details the purposes of the invention.  Although ignored by Forgent, the purposes of the invention are also relevant to claim construction.  *See, e.g., Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) (claims "must be interpreted in light of the teachings of the written description and purpose of the invention described therein").  First, the specification states that one purpose was to transmit, store, and later retrieve a multi-media teleconferencing "message."[9]  '746 patent at 2:22-24 ("It is therefore an object of this invention to provide a system for transmission of a multiple medium message, and for storage of the transmitted message for later retrieval.").  Second, it states that the multi-media teleconferencing message could "include audio, video, graphics, and any other information which may be acquired or generated by a computer."  *Id.* at 2:26-28.  Third, the specification stated that the invention would not require new, specialized teleconferencing hardware.  *Id.* at 2:29-30 ("It is a further object of this invention to provide such a system which utilizes existing teleconferencing hardware.").  Each listed "object of the invention" is directed to teleconferencing.

The "Background of the Invention" section consists of the description of teleconferencing, the identification of the problem and need addressed by the invention, and objects of the invention.  This introductory section of the patent frames the invention as teleconferencing.  Because this section characterizes the invention as a whole, these statements

_____

[9] As set forth in more detail below, the term "message" is used throughout the specification to refer to the information transmitted by the sending teleconferencing system and received, stored, and retrieved for later playback by the receiving teleconferencing system.

are particularly instructive regarding the scope of the claims.  *See C.R. Bard*, 388 F.3d at 864; *Microsoft*, 357 F.3d at 1348; *Biogen*, 318 F.3d at 1136-40.  This case is similar to *Nystrom*, where the Federal Circuit limited the term "board" to "materials cut from logs," in part based on statements in the "Background of the Invention" section.  *See Nystrom*, 424 F.3d at 1143 ("The Background of the Invention, thus, frames the invention in the context of wood decking materials cut from logs, even though it acknowledges that other materials exist.").

### c.      The Summary of the Invention

The specification then provides a "Summary of the Invention," which also characterizes the invention as a whole:

> The invention may be implemented into a *teleconferencing system* which receives and stores digital information representative of information from multiple media.  The system includes a communications multiplexer which, during normal transmission, routes incoming information to the proper output processors and devices in the system.  The system is programmable to receive and store an incoming *message* by controlling the communications multiplexer to route the incoming information to disk storage.  In playback, the communications multiplexer receives the stored information, and routes the appropriate portions thereof to the proper output devices in a similar manner as in normal transmission.

'746 patent at 2:37-49.  As with the Abstract, this description of "the invention" indicates that the invention is directed to improvements (*i.e.*, "storing messages") in teleconferencing systems.

### 2.      The Preferred Embodiment is a Teleconferencing System.

Of course, the preferred embodiment — indeed, every disclosed embodiment — is also a teleconferencing system.  Although claim terms are not limited merely because the preferred embodiment contains a specific feature, a patentee's choice of embodiments can shed light on the intended scope of the claims.  *See, e.g., Boss Control*, 410 F.3d at 1377; *C.R. Bard*, 388 F.3d at 865; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907-08 (Fed. Cir. 2004); *Astrazeneca*, 384 F.3d at 1340.  In this case, the choice of the preferred embodiment confirms that claims are directed to a teleconferencing device.

The specification provides a "Detailed Description of the Preferred Embodiment," a two-party video teleconferencing system. '746 patent at 3:11-14 ("[A] teleconferencing system according to the preferred embodiment of the invention will be described in the context of a two-party video teleconference."). The patent also suggests, but does not describe, a multi-party teleconferencing system and states that the alleged invention is broad enough to encompass such multi-party embodiments. *Id.* at 3:14-16 ("It should be understood, however, that multiple party teleconferences are also commonplace and will benefit from the present invention."); *see also id.* at 12:51-54 ("It should further be noted that while a two-party transmission is described hereinabove, the present invention is also applicable to multiple-party message storage and retrieval."). In other words, even when the patent suggests that the invention may encompass embodiments that are not described, *those embodiments are also teleconferencing systems.*[10]

The specification discloses that the preferred embodiment consists of two identical teleconferencing systems located at two separate locations, as depicted in Figure 1, below. Each system includes a computer (2), monitors (6), speakers (8), video camera (5), microphone (12), a keyboard (10), and other components for multimedia teleconferencing. The specification states that other input devices may include a graphics input tablet (9) and scanner/fax machine (7).[11] These input devices are for use by participants during a teleconference: "Additional input devices include … video copy stand 11 which includes a video camera supported so as to view

---

[10] Because the preferred embodiment is a two-party teleconferencing device, the constructions proposed herein encompasses the preferred embodiment. Indeed, the proposed constructions are broader than the preferred embodiment and may encompass multi-party teleconferencing systems. Thus, the proposed constructions encompass *every* embodiment even suggested or hinted at in the specification, not just the preferred embodiment.

[11] The specification states that video camera (5) and microphone (12) are contemplated for use in teleconferences: "Each system 1 also includes video camera 5 for acquiring the video image, microphone 12 for pickup of audio, usually of the teleconference participants, and keyboard 10 for entry of computer data for communication to the other location, as well as for entry of commands for computer 2 to control the teleconference transmission and receipt." *See* '746 patent at 3:45-51; *see also id.* at 8:33-36 ("Each of the input devices useful in a conventional video teleconference, as performed by the CS420R system noted hereinabove, may be transmitted by the sending system.").

drawings or handwriting by one of the *conference participants* at location B."  *Id*. at 3:59-63
(emphasis added).



FIG. 1

The computer is a conventional PC or its equivalent and it is connected to a network port.
The computer is connected to a bus which in turn is connected to other hardware.[12]  *See id*. at
Fig. 2; 3:66-5:43.  The specification states that the computer receives information from ports and
that "during a teleconference," most information is transmitted via a primary port.  There are also
"user ports," such as a fax port, "available for parallel usage during a teleconference."[13]  *Id*. at
4:37-43.  The patent states that although audio information may be multiplexed into the

---

[12] The specification discloses a single bus that carries teleconferencing signals within the
claimed video processing device.  Because the specification discloses only a single bus
embodiment, the teleconference data must be time-multiplexed to avoid data collisions on the
bus.  Accordingly, the patent does not disclose a system that permits simultaneous storage and
playback.

[13] As to faxing, the specification states:  "In addition, several user ports are also provided.
These user ports include … a conventional FAX port.  These user ports are available for parallel
usage *during a teleconference*; for example, if one party wishes to send a FAX *during a
teleconference*, the transmitted FAX information can be time-multiplexed into the *teleconference
bit stream*, with the FAX port on the receiving end capable of decoding the FAX information
from the multiplexed bitstream."  '746 patent at 4:33-43 (emphasis added).

"teleconference bit stream," the system may also receive "parallel telephonic communication."[14] *Id*. at 4:43-46.  The computer contains various processing circuits, along with a disk controller connected to disk storage.  This disk storage is the storage location for received messages.  *See id*. at 5:38-42.

Figure 3 and its associated text describe the "communications multiplexer" component of the computer.  *See id.* at 5:44-7:8.  The communications multiplexer includes a communications central processing unit (CPU) and program memory.[15]  The multiplexer also has audio and video buffers that are connected to audio and video processors.  The communications CPU controls the network port, as well as other ports, such as a fax port, and the buffers and memory.

The patent next describes the transmission of a message and storage for later retrieval. *See id*. at Fig. 4 (below).  The figure includes a pair of flow charts, one for the sending system and one for the receiving system.  This description references the decision points in the figure. This extensive description of the operation of the claimed system confirms that the invention is directed to a teleconferencing system that receives, stores, and retrieves messages.

---

[14] The specification also states that the system could have audio information processing helpful for teleconferences, including "echo cancellation."  '746 patent at 4:53-56.  The specification cites (and incorporates by reference) another patent owned by VideoTelecom entitled "Full Duplex Speakerphone."  *See* Crotty Decl., Ex. E (U.S. Patent No. 4,965,822).  The fact that the '746 patent incorporates by reference a speakerphone patent further demonstrates that the invention is directed to teleconferencing.

[15] The function of the "communications multiplexer" is to receive and route "teleconference data."  *See* '746 patent at 4:60-66 ("Communications multiplexer 20 is for *receiving input teleconference data* from interface 4, and from audio interface 22, and routing the information to the proper location within computer 2, and for also receiving information from its own system and presenting the same to interface 4 for transmission to other systems in the *teleconference*.") (emphasis added).



*FIG. 4*

According to the specification, the transaction begins with a telephone call (50). Upon receipt of the call, the receiving system detects a ring (60) and determines (62) whether the call has been answered. If so, the receiving system enters normal call mode and functions in the conventional manner to perform a teleconference (64). *Id*. at 7:20-40.

If the call is *not* answered, an automatic answer function is performed. In the automatic answer mode, if the call goes unanswered, the receiving system enters a record mode (66), and indicates to the sending unit that such a mode has been entered. That indication causes the sending system to exit a waiting loop. In the waiting loop, sending system determines (52) if the call has been answered. If not, the sending system determines if the sending operator has hung up (54), exiting the call if that occurs. If the caller has not hung up, the waiting loop continues (52). Upon receiving an indication from the receiving unit that the call has been answered, the

sending unit determines if the receiver is in record or normal mode (56).  Normal mode calls are processed in the conventional manner, as a standard teleconference (58).  *Id*. at 7:41-60.

The receiving system, once in record mode, determines the amount of available storage (68).  The maximum message length is communicated to the sending system (70).  At this point, the sending operator can decide whether to transmit a message.  Other information may also be transmitted by the receiving system, including identity information (*e.g.*, "You have reached …") and a timing message (*e.g.*, "Please begin your message at the tone.").  *Id*. at 8:13-16.  If the sending operator hangs up, the process ends (72).  If the sending operator does not hang up, a record signal is transmitted to the receiving system (74), indicating that a message is about to be transmitted for recording by the receiving system.  The receiving system then passes control to the recording process (80) and awaits and processes the message (82).  *Id*. at 7:61-8:28.

The sending system will then receive information from its various input devices, such as a microphone, camera, scanner, graphics tablet, keyboard, and other inputs.  Any of the input devices useful in a conventional video teleconference may be used.  The sending system sends the combined information as though a normal teleconference were taking place (76).  When the message is complete (78), the sending operator hangs up.  *Id*. at 8:29-44.  Figures 5 and 6 describe the process of transmitting data from the sending system to the receiving system and storing it for later retrieval.  *See id*. at 8:45-9:58.  Figure 7 describes the playback of a previously stored "message."  *Id*. at Fig. 7 and 9:59-10:44.  The patent states that once a message is transmitted and stored, the "receiving system will indicate to its owner or user that a new message has been received and awaits review by the operator."  *Id*. at 9:62-64.  Upon selection of a message for playback, the computer accesses the associated memory locations for the desired message.  The patent notes that "retrieval and processing of the stored message must be done at sufficient speed that the system will display the message in real time."  *Id*. at 10:8-11.  The patent also describes a "double buffered system."  *Id*. at 10:11-17.  Figures 8 and 9 describe the playback mode.  *See id*. at 10:45-11:26.

The patent further states that "errors may occur during the transmission of a message for storage, as in the case of live teleconferences."  *Id*. at 11:39-41.  The patent notes that "correction

of the data stream for such errors is useful in live teleconferences, but is not critical, as the

receiving party is able to ask the sending party to repeat himself or herself." *Id*. at 11:41-44.

Because the recipient cannot ask for retransmission for a stored message, "it is preferred that

some type of on-line error correction be utilized by the receiving system." *Id*. at 11:49-51.[16]

The patent also states that "additional interaction between the sending and receiving

systems may be provided to enhance the quality of the stored message."

> For example, analogously to conventional voice mail systems,
> some amount of editing capability may be provided in the
> receiving system at the initiation and control of the sending
> operator.  Such editing may allow for playback of the stored
> message at any time during its transmission, together with the
> ability to re-record some or all of the message transmitted at that
> time.  Initiation of such editing may be provided by transmission of
> a particular command by the sending system which is received,
> decoded and executed by the receiving system; alternatively, an
> edit function may, be provided upon completion of the
> transmission.

*Id*. at 12:16-27.  Thus, the patent suggests an optional feature of allowing the "sending operator"

to re-record a "message" in a manner similar to a voicemail system.

The specification then mentions in passing several additional possible embodiments, *all

of which* are teleconferencing systems that transmit and store messages for later playback.

- "Further in the alternative, it is contemplated that *the present invention*
  may be practiced by way of transmission of a *multiple-media message*
  from a *sending teleconference system* directly to computer storage, rather
  than to a *receiving teleconference system* as described hereinabove."  (*Id*.
  at 12:28-32 (emphasis added).)

- "It should further be noted that while a *two-party* transmission is described
  hereinabove, *the present invention* is also applicable to *multiple-party*
  message storage and retrieval."  (*Id*. at 12:51-54 (emphasis added).)

---

[16] The error correction discussion also demonstrates that the invention is directed to
teleconferencing.  The patent states that according to one error correction method,
"communications multiplexer 20 would transfer only non-corrupted data packets to bus ATBUS
for storage in disk storage 28, so that no corrupted data packets would be received by
communications multiplexer 20 during playback; *data packets would then be retransmitted
similarly as in a conventional interactive video teleconference which employs such a
retransmission protocol*."  '746 patent at 11:65-12:5 (emphasis added).

- "Alternatively, or in addition, the sending system may utilize a system, such as a Multipoint Control Unit, which is capable of *dialing* several locations at once, and communicating the *message* to each for storage thereat.  This allows for a broadcast multiple medium message to be transmitted for later retrieval at each receiving location, *according to the recipients' particular schedules and needs*."  (*Id.* at 12:62-13:2 (emphasis added).)

The first two of these statements are explicitly directed to "the present invention" and both are clearly teleconferencing ("sending teleconference system," "receiving teleconference system," "multiple-party message storage").  Because these passages characterize the invention as a whole, they are particularly instructive regarding the scope of the claims.  *See C.R. Bard*, 388 F.3d at 864; *Microsoft*, 357 F.3d at 1348; *Biogen*, 318 F.3d at 1136-40.  The third statement also demonstrates that the invention is directed to teleconferencing systems, as it suggests a sending system that "dials" multiple locations to send a "message" to recipients who can retrieve the message according to their own "schedules."

The specification concludes by summarizing the disclosed embodiment and returning to the problem addressed by the invention (*e.g.*, avoiding scheduling conflicts) from the "Background" section:

> The above-described system and method thus provides the capability for the transmission of a multiple medium message for storage and later retrieval and playback.  The ability of parties to fully communicate their desired messages using the most appropriate media is thus improved, as scheduling conflicts are avoided.  Furthermore, the recipient of the message is able to view the message at his convenience, and in the order desired (if multiple messages have been stored).  The communications between the sending and receiving unit, particularly relative to the maximum message length, further enhances the ability for meaningful messages to be transmitted.

'746 patent at 13:3-14.  Thus, the specification ends the same way it began, with a description of the problem that the invention was intended to address — avoiding scheduling conflicts — and a summary of the disclosure — a teleconferencing system that receives, stores, and retrieves messages.

In this case, the patentee's selection of its preferred embodiment sheds light on the scope of the invention, confirming the statements in other sections of the patent that describe the invention as a teleconferencing device.  "Although claims need not be limited to the preferred embodiment when the invention is more broadly described, *neither do the claims enlarge* what is patented beyond what the inventor has described as the invention."  *Inpro II Licensing*, 450 F.3d at 1355 (quoting *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed. Cir. 2001)) (internal quotation omitted and emphasis added).  The fact that *all* of the disclosed examples are teleconferencing systems adds support to the conclusion that the claims should be understood as directed to teleconferencing.  *See Astrazeneca*, 384 F.3d at 1341 (explaining that where the "solubilizers" in each of the patent's embodiments were "surfactants," term "solubilizers" in claims "should be limited to surfactants").[17]  Indeed, no other systems are disclosed or even suggested.  *See Honeywell Int'l*, 452 F.3d at 1319 (construing claim consistent with limited disclosure where no other embodiments were "disclosed or suggested").  The claims of the '746 patent should not be enlarged beyond what the specification discloses as the invention:  a teleconferencing system that stores messages for later retrieval.  *See On Demand Machine*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification.").

### 3.     The Frequent Use of the Term "Message" Demonstrates that the Invention is a Teleconferencing System.

The term "message" is used throughout the specification to refer to the information transmitted by the sending system and received, stored, and retrieved for later playback by the receiving system.  The term "message" (or its variants) is used in the specification more than 70

---

[17] The fact that teleconferencing is the only disclosed embodiment is probative as to the scope of the claims.  *See, e.g., Wang Labs, Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("The only embodiment described in the '669 patent specification is the character-based protocol, and the claims were correctly interpreted as limited thereto."); *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882-83 (Fed. Cir. 2000) (sealingly connected limitation limited to structures utilizing misaligned taper angles because specification described only one method of achieving sealing connection).

times, and it is used in the parts of the specification that describe the invention as a whole (*e.g.,* the Abstract, Background of the Invention, Summary of the Invention, etc.) as well as the Description of the Preferred Embodiment.  *See, e.g.,* '746 patent at Abstract, Figs. 4, 7, 2:23-24; 2:44; 4:27; 5:41; 6:62; 7:13; 7:63-65; 8:10; 9:58-63; 10:5.  For example, the specification states: "It is therefore an object of *this invention* to provide a system for transmission of a multiple medium *message*, and for storage of the transmitted *message* for later retrieval."  *Id*. at 2:22-24 (emphasis added); *see also id.* at 2:42-45 ("The system is programmable to receive and store an incoming *message* by controlling the communications multiplexer to route the incoming information to disk storage.") (emphasis added).

The term "message" is generally defined as short communication.  Definitions of the term "message" in the communications context include "communication in speech, writing, or signals, usually a brief one, and often one left for a recipient who cannot be directly contacted at the time."  *See* Crotty Decl., Ex. F (Encarta World English Dictionary).  The appropriateness of this definition is confirmed by the specification, which states:  "Scheduling conflicts, time zone differentials, and other events which prevent parties from meeting face-to-face, also preclude meeting by phone or teleconference.  These factors have presented the need for storage and retrieval of *messages*."  *See* '746 patent at 2:7-11 (emphasis added).  The repeated use of the term "message" throughout the '746 patent further demonstrates that the claims are directed to teleconferencing systems.[18]

### C.   The Claims Include Teleconferencing Limitations.

The fact that the invention is directed to a teleconferencing device is reflected in three claim terms:  (1) "video processing device," (2) "communications central processing unit," and (3) "communications bus."  None of these terms had a common meaning to one of ordinary skill in the art in 1991.  Accordingly, all of the parties agree that their meaning must be ascertained by

---

[18] Of course, television programming is not considered a "message."  Katie Couric is the new anchor of an evening news program, not a "news message," and "Lost" is a hit TV show, not a "TV message."

reference to the specification.  When the claims are read in light of the specification, the "inescapable conclusion" is that the claims are limited to teleconferencing.  *See Microsoft*, 357 F.3d at 1348; *Alloc*, 342 F.3d at 1370; *SciMed*, 242 F.3d at 1342.  In other words, the "very character of the invention" requires that the teleconferencing limitation be a part of every embodiment.  *See Alloc*, 342 F.3d at 1370.  In cases such at this, where "the specification makes clear at various points that the claimed invention is narrower than the claim language might imply," the Federal Circuit has held that "it is entirely permissible and proper to limit the claims."  *Id.*

### 1.     The Term "Video Processing Device" Means "A Device that Processes Video Teleconferencing Messages."

The term "video processing device" occurs in both the preamble and in the body of the claim.  However, the term does not appear in the specification, and Forgent does not contend that it has a conventional meaning to one of skill in the art.[19]  Properly construed in light of the specification, "video processing device" means "a device that processes video teleconferencing messages."  This meaning is clear from the entire disclosure, including the Abstract, the Background of the Invention, Summary of the Invention, and the Detailed Description of the Preferred Embodiment.

As set forth above, the Abstract could not be clearer that the patent discloses a "teleconferencing system" that receives and stores "messages" for later retrieval.  *See* Section B.1.a, *supra*.  The "Background of the Invention" section further demonstrates that the invention is directed to an improved teleconferencing system.  *See* Section B.1.b, *supra*.  Again, these statements regarding teleconferencing are directed to the *invention as a whole*, not specific embodiments, and are thus persuasive evidence of a limiting definition.  *See C.R. Bard*, 388 F.3d at 864; *Microsoft*, 357 F.3d at 1348.  Moreover, the preferred embodiment is a teleconferencing system, as is every embodiment even suggested in the specification.  *See* Section B.2, *supra*.

---

[19] The parties all agree that this term has substantive significance.  For example, no party contends that the term should be construed as, for example, "a device that processes video."

This choice of embodiments also demonstrates a more limited scope.  *See, e.g., Boss Control*, 410 F.3d at 1377.

Because the specification discloses only a device that processes teleconferencing messages and consistently characterizes the invention as one that processes "messages" (*see* Section B.3, *supra*), the term "video processing device" is properly construed in light of this limited disclosure.  Although the word "video" may, standing alone, have a broader meaning in other contexts, in the context of the '746 patent, the term "video processing device" means a device that processes teleconferencing messages.  As the Federal Circuit has held, "the claims cannot be of broader scope than the invention that is set forth in the specification."  *On Demand Machine*, 442 F.3d at 1340.  The invention disclosed in the specification is an improved teleconferencing device, and the claims cannot be defined to "eliminate these constraints" in order to embrace an invention that is not disclosed in the specification.  *Id.*[20]

For these reasons, the term "video processing device" means "a device that processes teleconferencing messages."  *See Biogen*, 318 F.3d at 1136-40 (limiting claims to the invention disclosed in the Abstract, Summary of the Invention, and Description of the Preferred Embodiments, and rejecting plaintiff's attempt to interpret the invention more broadly).  There is simply nothing in the patent that would support anything other than claims directed to a teleconferencing system.

### 2.   The Term "Communication Central Processing Unit" Means "CPU That Processes Teleconferencing Messages."

The term "communication central processing unit" ("communication CPU") is used in the specification, but it too has no ordinary meaning in the art.  *See* Crotty Decl., Ex. G (McLaughlin Report (Docket No. 272, Ex. C)), ¶ 4.1.1; Forgent's Br. at 8-9.  There are at least

---

[20] It is not necessary for the patentee to have "disavowed" claim scope in cases where, as here, "the scope of the invention is clearly stated in the specification."  *On Demand Machine*, 442 F.3d at 1340 (citing *Astrazeneca*, 384 F.3d at 1339-40).

two CPUs disclosed in the specification, a "CPU" and a "communications CPU."[21]  The claim

construction issue here thus turns on the meaning of the term "communication" when it modifies

the term CPU.  Because the issue is the meaning of a term ("communication") that appears in the

claim, this is *not* a situation where a limitation is imported into the claims.  Rather, this is a

situation where the claim term "communication" must be construed in the context of the

invention and field of art.[22]  *See Curtiss-Wright Flow Control*, 438 F.3d at 1379-80.  As

demonstrated herein, the specification demonstrates that "communication" means

teleconferencing.

The only "communication" mentioned in the specification is teleconferencing.  Simply

put, in the context of the '746 patent, the term "communication" means teleconferencing.  For

example, the specification states that the "communication multiplexer" is intended to receive

"teleconference data" and to transmit such data "to other systems in the teleconference."[23]  The

"communications CPU" is part of the "communications multiplexer" and, therefore, the

"communications CPU" is also for processing teleconferencing data.  *See* '746 patent at 5:45-46

("Communications multiplexer 20 includes a communications CPU 30[.]").

_____

[21] The specification shows that the "communications CPU" is a special-purpose CPU that
is different from a regular CPU.  *See, e.g.,* '746 patent at Figs. 2, 3 (showing both a regular
"CPU 14" and a separate, special-purpose CPU defined as "communication CPU 30").

[22] Forgent's expert agrees that the "communication" modifier requires that a particular
function or type of processing be performed by the "communication CPU."  *See* Crotty Decl.,
Ex. H (Mercer Decl. (Docket No. 272, Ex. B)), ¶ 17 ("One of ordinary skill in the art would
understand that the term 'communication' to be an adjective that explains the function or type of
processing to be done by the 'central processing unit.'").

[23] *See* '746 patent at 4:60-66 ("Communications multiplexer 20 is for *receiving input
teleconference data* from interface 4, and from audio interface 22, and routing the information to
the proper location within computer 2, and for also receiving information from its own system
and presenting the same to interface 4 for transmission to other systems *in the teleconference*.");
*see also* Abstract ("The system includes a *communications multiplexer* which, in normal mode,
receives the *incoming message* and routes the *message* to various output functions, including
video, audio, and computer display."); *id.* ("During playback, the communications multiplexer
receives data from the disk storage, and controls its communication to the various output
functions, in the same manner as during receipt of a normal incoming *message* during an
*interactive teleconference*.") (all emphasis added).

The specification also demonstrates that the communication CPU processes "messages." In describing the functions of the "communication CPU," the specification states:

> Referring now to FIG. 4, the operation of systems 1, including CPU 14 and *communications CPU 30 programmed* according to this embodiment of the invention, in performing the function of *transmission of a multi-media message and its storage for later retrieval*, will now be described in detail.

*Id.* at 7:9-14 (emphasis added).  Similarly:

> The time-multiplexing performed by communications CPU 30 is identical to that performed for *real-time message information* being received from a sending unit; as a result, the information forwarded to the video, audio, and CPU portions of the receiving system is presented *as though the message were incoming at that time*.

*Id.* at 11:6-12 (emphasis added).

In sum, the only type of "communication" mentioned in the specification is teleconferencing.  Moreover, the specification repeatedly and consistently states that the "communication CPU" processes "messages."  Because "communication" means teleconferencing in the context of the '746 patent, the term "communication CPU" means "CPU that processes teleconferencing messages."

### 3.     The Term "Communication Bus" Means "Bus Through Which Teleconferencing Signals are Transmitted."

For the reasons set forth above,[24] the term "communication bus" must also be construed in light of the specification.  As with "communication multiplexer" and "communication CPU," the specification demonstrates that "communication" means teleconferencing.  The "communication bus" (called COMBUS in the specification) is attached to the communication CPU.  *Id.* at 5:52-53 ("Communications CPU 30 is bidirectionally connected to bus COMBUS.").  The "Network Port," which transmits teleconference data, is also connected to the

---

[24] As with "communication CPU," no party contends that the term "communication bus" has an ordinary meaning to one of skill in the art, and all parties have proposed substantive constructions for this term.

communication bus. *Id.* at 5:60-62 ("Network port 38… is connected to bus COMBUS and is controlled by communications CPU 30."). In other words, the components attached to the communication bus process teleconference data. The signals that move through the communication bus are therefore teleconferencing signals.

In the context of the '746 patent, all "communication" is teleconferencing and the function of the "communication bus" is to carry teleconference data. Thus, in the context of the '746 patent specification, the term "communication bus" means "a bus through which teleconferencing signals are transmitted."

## IV.   FORGENT'S PROPOSED CONSTRUCTIONS ARE WRONG

Forgent's proposed constructions for these three terms are wrong, as they fail to follow Federal Circuit claim construction precedent by alternately ignoring, selectively citing, and mischaracterizing the specification.

Forgent's proposed constructions depart from the rules of claim construction and the specification because Forgent seeks to encompass DVRs with a patent that is clearly directed to teleconferencing. Although Forgent wants to stretch the claims of the '746 patent to cover digital recording and storage of television programming, the patent makes no mention of any such technology or functions. There is no description of DVR functionality such as "pausing" a television program while watching it, immediately replaying a portion of a program (*e.g.*, a key play in a football game), or watching one program while recording another. Nor is there any discussion of the simpler features that DVRs share with the VCRs that were popular at the 1991 filing date, such as rewinding or fast-forwarding through television programs. The patent never uses the words "pause," "replay," "rewind," or "fast-forward." Indeed, the patent does not even discuss transmitting, receiving, or recording television programming. Nothing in the specification remotely suggests that the inventors ever contemplated DVRs.[25]

---

[25] The prosecution history confirms that the invention of the '746 patent is unrelated to television, let alone DVRs. U.S. Application No. 08/425,729 ("'729 application") contains the same specification as the '746 patent. During prosecution of that application, Forgent

(Footnote continues on following page.)

26

There are at least three major errors in Forgent's proposed constructions.

*First*, because Forgent improperly seeks to broaden the scope of the claims beyond what it disclosed in the patent, Forgent necessarily ignores the vast majority of the specification.  In particular, Forgent ignores the consistent statements throughout the specification that the invention is an improved teleconferencing system.  Instead, Forgent cites to isolated snippets of the description of the preferred embodiment while avoiding all of the context for its carefully selected passages.[26]  The Federal Circuit has made it clear that this pick-and-choose method of claim construction is improper.  *See, e.g., Phillips*, 415 F.3d at 1313; *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("The court must always read the claims in view of the *full* specification." (emphasis added)).

*Second*, in a transparent attempt to avoid invalidating prior art, Forgent seeks when convenient to read limitations into the claims directly from the preferred embodiment, or even optional aspects of the preferred embodiment.  The Federal Circuit has repeatedly held that

---

(Footnote continued from previous page)

distinguished its invention from a prior art patent to McCalley.  *See* Ex. I ('729 application, Prelim. Amendment, April 20, 1995) at ESF 519; Crotty Decl., Ex. J (U.S. Patent No. 5,208,665).  Forgent distinguished the patent by arguing that "McCalley relates to cable television systems;" "deals primarily with stored audio and video, not primarily with real time, full motion audio and video;" and is a "very complex system" that relies on processing performed by cable "headend" systems.  Crotty Decl., Ex I ('729 application, Prelim. Amendment, April 20, 1995) at ESF 519.  These supposedly distinguishing characteristics are shared by DVRs.  Like McCalley, DVRs "relate[] to cable television systems," and connect to cable headends (or receive satellite transmissions).  Like McCalley, DVR functionality "deals primarily with stored audio and video."  *Id.*  In distinguishing McCalley, Forgent effectively distinguished DVRs.  Forgent emphasized the significance of their invention's differences from McCalley, arguing that "[t]here are so many differences between McCalley's system and the system of the present invention, and those differences are so fundamental, that McCalley should be considered to be nonanalogous art."  *Id.*.  This unequivocal statement precludes a construction that encompasses DVRs.  Moreover, as set forth in the separate brief, the '746 patent distinguishes "satellite or other closed-circuit television techniques" from the disclosed invention.

[26] Moreover, Forgent simply changes the parts of the specification it does not like.  For example, the specification makes it clear that the invention is directed to a teleconferencing system that receives and stores multimedia teleconferencing "messages."  Because the term "message" demonstrates that the claims are directed to teleconferencing, Forgent simply rewrites the patent in its brief by consistently substituting the phrase "motion video and synchronized audio" for the term "message," a phrase that *never* even appears in the specification.

limitations should not be read into the claims simply because they appear in the preferred embodiment.  *See, e.g., Comark Commc'ns*, 156 F.3d at 1186.  Some of the limitations Forgent seeks to read into the claims are not even found in the specification at all.  For example, the phrase "motion video and synchronized audio" does not appear anywhere in the '746 patent. There is no basis whatsoever to read such limitations into the claims.

 *Third*, Forgent's proposed constructions are premised on the extrinsic evidence, primarily the opinions of its retained expert, and on various carefully-selected statements from the prosecution history, largely the prosecution histories of other applications and claims with different language.  The Federal Circuit has consistently stated that extrinsic evidence, particularly the conclusory opinions of retained experts, is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'"  *Phillips*, 415 F.3d at 1317 (citing *C.R. Bard*, 388 F.3d at 862); *see also Astrazeneca*, 384 F.3d at 1337.

 EchoStar and Digeo will briefly summarize the shortcomings of Forgent's proposed constructions below.  These shortcomings will be discussed in greater detail in the separate brief filed herewith.

### A. "Video Processing Device"

 Forgent's proposed construction for the term "video processing device" has virtually no relationship to the claim language or the specification.  Forgent proposes that the term means "a device controlled by a computer, separate from the communications central processing unit, to process one or more motion video and synchronized audio signals."[27]  The "one or more motion video and synchronized audio signals" has no basis whatsoever, as the phrase "motion video and synchronized audio" never appears in either the claim or the specification.  Forgent suggests that this limitation should be read into the claim because some of the potential inputs (*e.g.,* a video

---

[27] As demonstrated in the separate brief, the "computer controlled" aspect of the preamble is not limiting because it does not provide an antecedent basis for any element in the body of the claim.  To the extent it is limiting, it should be construed consistent with the disclosure of the specification, as detailed in the separate brief.

camera) provide synchronized audio and video.  However, the specification also indicates that the device may receive non-motion images (*e.g.*, faxes and slide presentations) that are not synchronized with audio.  *See, e.g.,* '746 patent at 2:19-24; 4:35-43.  There is nothing to suggest that this limitation should be read into the claims.  *See Microsoft*, 357 F.3d at 1352 (refusing to read limitation into claim where specification did not indicate that the limitation was necessary).

## B.  "Communication Central Processing Unit"

Forgent's proposed construction for the term "communication central processing unit" is a "programmable communication processing device arranged to independently control one data transfer during another data transfer."  This construction is not derived from the claim language, nor is it derived from the specification.  As demonstrated above, the specification dictates the construction proposed by EchoStar and Digeo.  Forgent's construction, on the other hand, fails to address the central question posed by this claim language:  what is meant by associating the modifier "communication" with the common term "central processing unit."  In contrast to Forgent's proposal, EchoStar and Digeo's proposed construction addresses that issue.

Moreover, Forgent's construction selectively picks and chooses from the features of the preferred embodiment.  Forgent proposes that the communication CPU is "programmable," but that limitation is not set forth in the claim.  Nor is there anything in the specification to suggest that this limitation was necessary to the invention.[28]  In any event, it is improper to read limitations from the preferred embodiment into the claim.  *See Comark Commc'ns*, 156 F.3d at 1186.

Forgent also attempts to read the following limitation into the claim:  "arranged to independently control one data transfer during another data transfer."  The term "arranged" makes no sense for a device that is programmable.  And, there is simply nothing in the specification or claim to support reading the limitation "independently control one data transfer

---

[28] Forgent suggests that this "programmable" requirement comes from the claim language because it is connected to "program memory."  Forgent does not explain why coupling to "program memory" means that the communication CPU itself is programmable.

during another data transfer" into the claim.  To the extent this part of Forgent's construction simply parrots its construction of the "wherein" clause later in the claim, it is unnecessary and confusing.  Forgent's construction is simply a wish list of limitations that support Forgent's litigation positions, a fact made clear by the lack of any specification support and the reliance on extrinsic material.  In particular, there is nothing in the claim or specification to suggest that the claim includes an "independently control one data transfer during another data transfer" limitation.  In fact, this feature is not even found in the specification.

### C.   "Communication Bus"

Forgent contends that the term "communication bus" means "a set of conductors that bidirectionally links the programmable communication processing device and at least two devices to receive and route one or more motion video and synchronized audio signals."  Again, this proposed construction has no support in the claim language or the specification and is almost entirely derived from particular characteristics of the preferred embodiment or extrinsic material.  First, there is no "programmable communication processing device" in the claim.  If Forgent means the "communication CPU," it should so state.  Second, the "one or more motion video and synchronized audio signals" limitation is simply made up, as the phrase "motion video and synchronized audio" never appears in the claim or the specification.

### V.   CONCLUSION

For these reasons, the terms "video processing device," "communication central processing unit," and "communication bus" should be construed as set forth above.  For the reasons set forth above and in the separate brief, Forgent's constructions are erroneous and should be rejected.

Dated:  October 10, 2006

Respectfully Submitted,


/s/ Charles S. Barquist
Charles S. Barquist (*Pro Hac Vice*)
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California  90013-1024

Telephone:  (213) 892-5200
Facsimile:  (213) 892-5454
CBarquist@mofo.com

Harold J. McElhinny (*Pro Hac Vice*)
Rachel Krevans (*Pro Hac Vice*)
Jason A. Crotty (*Pro Hac Vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

Melvin R. Wilcox, III
Attorney-in-Charge
State Bar No. 21454800
SMEAD, ANDERSON & DUNN LLP
2110 Horseshoe Lane
P.O. Box 3343
Longview, Texas 75606
Telephone:  (903) 232-1892
Facsimile:  (903) 232-1881
mrw@smeadlaw.com

ATTORNEY FOR DEFENDANTS
ECHOSTAR TECHNOLOGIES CORP. and
ECHOSPHERE LLC

*/s/ Jerry A. Riedinger*
Jerry A. Riedinger (*Pro Hac Vice*)
Jessica L. Rossman (*Pro Hac Vice*)
PERKINS COIE LLP
1201 Third Avenue, 48th Floor
Seattle, Washington 98101
Telephone:  (206) 359-8000
Facsimile:  (206) 359-9000
JRiedinger@perkinscoie.com

Herbert A. Yarbrough, III
100 E. Ferguson Street, Suite 1015
Tyler, Texas 75702

ATTORNEYS FOR DIGEO, INC.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).


*/s/ Charles S. Barquist*
Charles S. Barquist